# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIRST CIRCUIT

————————

AURELIUS INVESTMENT, LLC, *et al.*,

Appellants,

v.

COMMONWEALTH OF PUERTO RICO, *et al.*,

Appellees.

————————

ASSSURED GUARANTY CORPORATION, *et al.*,

Appellants,

v.

FINANCIAL OVERSIGHT AND MANAGEMENT BOARD, *et al.*,

Appellees.

————————

UNIÓN DE TRABAJADORES DE LA INDUSTRIA ELÉCTRICA
Y RIEGO (UTIER),

Appellant,

v.

PUERTO RICO ELECTRIC POWER AUTHORITY, *et al.*,

Appellees.

————————

On Appeal from the United States District Court
for the District of Puerto Rico (Nos. 17-bk-3283-LTS, 17-bk-3567-LTS,
18-ap-87-LTS, 17-228-LTS)

————————

# BRIEF FOR THE UNITED STATES

————————

JOSEPH H. HUNT
*Assistant Attorney General*

THOMAS G. WARD
*Deputy Assistant Attorney General*

MARK R. FREEMAN
MICHAEL S. RAAB
MICHAEL SHIH
LAURA E. MYRON
*Attorneys, Appellate Staff*
*Civil Division, Room 7222*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202) 514-4819*
*laura.e.myron@usdoj.gov*

# TABLE OF CONTENTS

**Page**

INTRODUCTION..................................................................................................... 1

STATEMENT OF JURISDICTION ........................................................................ 4

STATEMENT OF THE ISSUE ............................................................................... 4

STATEMENT OF THE CASE ................................................................................ 5

I.    Statutory Background............................................................................ 5

II.   Factual Background .............................................................................. 8

III.  Procedural Background......................................................................... 9

SUMMARY OF ARGUMENT ............................................................................ 10

STANDARD OF REVIEW.................................................................................. 14

ARGUMENT........................................................................................................ 14

I.    The Oversight Board Is A Territorial Entity Whose Members
      Are Not Subject To The Appointments Clause................................... 15

      A.    The Appointments Clause does not constrain Congress's
            plenary authority to establish and structure territorial
            governments................................................................................ 15

      B.    Historical practice confirms that the Appointments Clause
            does not constrain the appointment of territorial officials ...... 21

            1.    Every major United States territory today is governed
                  in a manner that would be inconsistent with the
                  Appointments Clause ....................................................... 21

            2.    The tradition of territorial popular elections dates to the
                  beginning of the Republic................................................. 24

3.    The territorial government of Puerto Rico has never been appointed in conformity with the requirements of the Appointments Clause.................................................. 26

C.    Congress established the Oversight Board as an organ of the Puerto Rico territorial government ........................................... 27

II.    Appellants' Contrary Arguments Lack Merit ....................................... 30

A.    Appellants' theory cannot be squared with longstanding historical practice or Supreme Court precedent ........................................ 31

1.    Appellants offer no valid basis for distinguishing elected territorial officers ............................................. 31

2.    Congress's voluntary adoption of Appointments Clause procedures does not mean the Appointments Clause applies to territorial officials of its own force ............................................. 33

3.    Appellants misread Supreme Court decisions concerning territorial judges, military officers, and federal property.............. 37

4.    PROMESA's list mechanism does not impermissibly aggrandize Congress's authority....................................... 40

B.    The Board is an entity within the territorial government of Puerto Rico................................................................... 46

CONCLUSION ........................................................................... 52

CERTIFICATE OF SERVICE

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

**Cases:**                                                          **Page(s)**

*Altair Global Credit Opportunities Fund (A), LLC v. United States,*
No. 17-970C, 2018 WL 3425051 (Fed. Cl. July 13, 2018) .......................................... 48

*American Ins. Co. v. 356 Bales of Cotton,*
26 U.S. (1 Pet.) 511 (1828) ................................................................................16, 19, 38

*Benner v. Porter,*
50 U.S. (9 How.) 235 (1850) .............................................................. 17, 18, 38, 43

*Binns v. United States,*
194 U.S. 486 (1904) ................................................................................................. 28

*Boumediene v. Bush,*
553 U.S. 723 (2008) ................................................................................................. 39

*Buckley v. Valeo,*
424 U.S. 1 (1976) ..................................................................................................... 15

*Cincinnati Soap Co. v. United States,*
301 U.S. 308 (1937) ........................................................................................2, 19, 28

*Clinton v. Englebrecht,*
80 U.S. (13 Wall.) 434 (1871) ....................................................... 11, 16, 20, 37

*Domenech v. National City Bank of N.Y.,*
294 U.S. 199 (1935) ................................................................................................. 32

*Dorr v. United States,*
195 U.S. 138 (1904) ................................................................................................. 19

*Edward J. DeBartolo Corp. v. Florida Gulf Coast Bldg. & Constr. Trades Council,*
485 U.S. 568 (1988) ................................................................................................. 46

*El Paso & Ne. Ry. Co. v. Gutierrez,*
215 U.S. 87 (1909) ................................................................................................... 16

*Federal Election Comm'n v. NRA Political Victory Fund,*
6 F.3d 821 (D.C. Cir. 1993) .................................................................................41, 42

*Free Enter. Fund v. Public Co. Accounting Oversight Bd.*,
    561 U.S. 477 (2010) ....................................................................... 46, 51

*Freytag v. Commissioner*,
    501 U.S. 868 (1991) ....................................................... 18, 20, 38, 45

*Hechinger v. Metropolitan Washington Airports Auth.*,
    36 F.3d 97 (D.C. Cir. 1994) .................................................... 44

*Ex parte Hennen*,
    38 U.S. (13 Pet.) 230 (1839) .................................................... 38

*Kendall v. United States ex rel. Stokes*,
    37 U.S. (12 Pet.) 524 (1838) .................................................... 19

*Lebron v. National R.R. Passenger Corp.*,
    513 U.S. 374 (1995) ............................................................ 47, 48

*Lucia v. SEC*,
    138 S. Ct. 2044 (2018) ....................................................... 15, 20, 37

*Metropolitan R. Co. v. District of Columbia*,
    132 U.S. 1 (1889) ............................................................. 49, 50

*Metropolitan Wash. Airports Auth. v. Citizens for Abatement of Aircraft Noise, Inc.*,
    501 U.S. 252 (1991) ....................................................... 42, 43, 44

*Mistretta v. United States*,
    488 U.S. 361 (1989) .............................................................. 43

*M'Culloch v. Maryland*,
    17 U.S. (4 Wheat.) 316 (1819) .............................................. 21, 33

*National Bank v. County of Yankton*,
    101 U.S. 129 (1879) .............................................................. 16

*NLRB v. Noel Canning*,
    134 S. Ct. 2550 (2014) ................................................. 21, 33, 36, 42

*Ortiz v. United States*,
    138 S. Ct. 2165 (2018) .................................................... 18, 38, 39

*Palmore v. United States*,
    411 U.S. 389 (1973) ................................................... 10, 17, 19, 28

iv

*Puerto Rico v. Franklin California Tax-Free Trust,*
136 S. Ct. 1938 (2016) ................................................................... 5

*Puerto Rico v. Sanchez Valle,*
136 S. Ct. 1863 (2016) ........................... 10, 17, 19, 21, 26, 32, 50

*Rodriguez v. Popular Democratic Party,*
457 U.S. 1 (1982) ...................................................................... 22

*Simms v. Simms,*
175 U.S. 162 (1899) ............................... 10, 16, 17, 32, 43

*Snow v. United States,*
85 U.S. (18 Wall.) 317 (1873) ........................... 18, 19, 32, 50

*United States v. Cardozo,*
129 F.3d 6 (1st Cir. 1997) ............................................... 14

*United States v. Ferreira,*
54 U.S. (13 How.) 40 (1851) ............................................ 37, 38

*United States v. Gratiot,*
39 U.S. (14 Pet.) 526 (1840) ........................................... 39

*Wal-Mart Puerto Rico, Inc. v. Zaragoza-Gomez,*
174 F. Supp. 3d 585 (D.P.R.), *aff'd,*
834 F.3d 110 (1st Cir. 2016) ........................................... 1, 5

## Constitutions:

U.S. Const.:
Art. II, § 2, cl. 2 ...................................................2, 15, 32
Art. II, § 3 .......................................................... 36
Art. IV .............................................................. 1
Art. IV, § 3, cl. 2 .............................................. 6, 15

Puerto Rico Const:
Art. III, § 1 ....................................................... 22
Art. IV, § 1 ........................................................ 22
Art. IV, § 4 ........................................................ 22
Art. IV, §§ 5-6 .................................................... 23
Art. V, § 8 ......................................................... 23

**Statutes:**

Act of Aug. 7, 1789, ch. 8, 1 Stat. 50......................................................24, 43

Act of Aug. 5, 1947, ch. 489, 61 Stat. 770 ................................. 27

Act of July 30, 1950, ch. 446, 64 Stat. 319..............................21, 33

Act of July 3, 1952, ch. 567, 66 Stat. 327............................17, 22, 33

District of Columbia Financial Responsibility and Management
    Assistance Act of 1995, Pub. L. No. 104-8, 109 Stat. 97............................ 6

Foraker Act, ch. 191, 31 Stat. 77 (1900) ...................... 26, 27, 34, 51

Guam Elective Governor Act,
    Pub. L. No. 90-497, 82 Stat. 842 (1968) ........................................ 23

Intergovernmental Personnel Act of 1970,
    5 U.S.C. § 3371-3375.......................................................................... 29

Jones Act, ch. 145, 39 Stat. 951 (1917) .................................27, 34, 51

Puerto Rico Oversight, Management, and Economic Stability Act,
    Pub. L. No. 114-187, 130 Stat. 549 (2016) ................................... 1

    48 U.S.C. § 2121(a) .........................................................1, 6, 28

    48 U.S.C. § 2121(b)(2) .................................................... 6, 28

    48 U.S.C. § 2121(c)(1) ................................. 1, 3, 4, 6, 12, 28, 46-47

    48 U.S.C. § 2121(e)(1) ...................................................... 7

    48 U.S.C. § 2121(e)(2)(A)(i)-(v) ....................................... 7

    48 U.S.C. § 2121(e)(2)(A)(vi) .......................................... 7

    48 U.S.C. § 2121(e)(2)(C) ................................................ 7

    48 U.S.C. § 2121(e)(2)(E) ..........................................7, 8, 45

    48 U.S.C. § 2121(e)(2)(G) ........................................8, 41, 46

    48 U.S.C. § 2121(e)(3) ..................................................7, 28

48 U.S.C. § 2121(e)(5)(A)-(B) ............................................................ 7

48 U.S.C. § 2121(e)(6) ..................................................................... 46

48 U.S.C. § 2121(g) ........................................................................ 29

48 U.S.C. § 2121(h)(3) .................................................................... 28

48 U.S.C. § 2122 ............................................................................ 28

48 U.S.C. § 2123(d) ........................................................................ 30

48 U.S.C. § 2124 ............................................................................ 29

48 U.S.C. § 2124(f) ......................................................................... 29

48 U.S.C. § 2124(h) ........................................................................ 29

48 U.S.C. § 2124(*l*) ........................................................................ 29

48 U.S.C. § 2124(n) ........................................................................ 30

48 U.S.C. § 2127 ............................................................................ 28

48 U.S.C. § 2127(b) ........................................................................ 29

48 U.S.C. § 2128 ............................................................................ 29

48 U.S.C. § 2129(a) ........................................................................ 30

48 U.S.C. § 2129(b) ........................................................................ 30

48 U.S.C. §§ 2141—2142 ................................................................. 6

48 U.S.C. §§ 2143—2144 ................................................................. 7

48 U.S.C. § 2147 ............................................................................. 7

48 U.S.C. § 2149 ............................................................................. 7

48 U.S.C. § 2166(a)(1) ..................................................................... 4

48 U.S.C. § 2166(e)(3) ..................................................................... 4

48 U.S.C. § 2172(a) ......................................................................... 7

48 U.S.C. § 2175(a) ..................................................... 7

48 U.S.C. § 2175(b) ..................................................... 7

48 U.S.C. § 2194(b) ..................................................... 8

48 U.S.C. § 2194(m) ..................................................... 8

48 U.S.C. § 2194(m)(1) ........................................... 6, 49

48 U.S.C. § 2194(m)(1)-(3) ........................................ 28

48 U.S.C. § 2194(m)(4) ................................................. 6

Virgin Islands Elective Governor Act,
Pub. L. No. 90-496, 82 Stat. 837 (1968) ................... 23

18 U.S.C. § 208 ............................................................ 30

40 U.S.C. § 102(4)-(5) ................................................ 30

40 U.S.C. § 321(c)(2) .................................................. 30

**Statutes Organizing U.S. Territories:**

1 Stat. 50 (1789) (Nw. Terr.) ................................. 24, 43

1 Stat. 123 (1790) (Sw. Terr.) ............................... 25, 44

1 Stat. 549 (1798) (Miss.) .............................. 25, 36, 44

2 Stat. 58 (1800) (Ind.) ................................. 25, 36, 44

2 Stat. 309 (1805) (Mich.) ..................................... 25, 44

2 Stat. 322 (1805) (Orleans) ................................. 25, 44

2 Stat. 743 (1812) (Mo.) ................................. 25, 26, 44

2 Stat. 514 (1809) (Ill.) ........................................ 25, 44

3 Stat. 371 (1817) (Ala.) ...................................... 25, 51

3 Stat. 493 (1819) (Ark.) ............................... 25, 26, 44

4 Stat. 332 (1829) (Fla.) ..................................................................25, 35

5 Stat. 10 (1836) (Wis.) ........................................................25, 26, 35, 50

5 Stat. 235 (1838) (Iowa) ...........................................................25, 26, 35

9 Stat. 323 (1848) (Or.) ...................................................................25, 26

9 Stat. 403 (1849) (Minn.) ........................................................25, 26, 35

9 Stat. 446 (1850) (N.M.) .........................................................25, 26, 35

9 Stat. 453 (1850) (Utah) ..........................................................25, 26, 35

10 Stat. 172 (1853) (Wash.) .............................................................25, 26

10 Stat. 277 (1854) (Nebr., Kan.) ...................................................25, 26

12 Stat. 172 (1861) (Colo.) ..............................................................25, 26

12 Stat. 209 (1861) (Nev.) ...............................................................25, 26

12 Stat. 239 (1861) (Dakota) ..........................................................25, 26

12 Stat. 664 (1863) (Ariz.) ...............................................................25, 26

12 Stat. 808 (1863) (Idaho) .............................................................25, 26

13 Stat. 85 (1864) (Mont.) ...............................................................25, 26

15 Stat. 178 (1868) (Wyo.) ..............................................................25, 26

26 Stat. 81 (1890) (Okla.) .................................................................25, 26

31 Stat. 141 (1900) (Haw.) ..............................................................25, 26

37 Stat. 512 (1912) (Alaska) ...................................................................25

**Other Authorities:**

David P. Currie:

  *The Constitution in Congress: The Federalist Period, 1789-1801* (1997) .............................24

  *The Constitution in Congress: The Jeffersonians, 1801-1829* (2001) ......................................34

1 Logan Esarey, *History of Indiana From Its Exploration to 1922* (1922)...........................44

42 Fed. Reg. 48398 (Sept. 23, 1977) ............................................... 23

51 Fed. Reg. 40399 (Nov. 7, 1986) ................................................... 23

Government Development Bank for Puerto Rico,
*Commonwealth of Puerto Rico Financial Information and Operating Data Report*
(Dec. 18, 2016), https://go.usa.gov/xP2Zq ..................................... 5

4 Green Haywood Hackworth, *Digest of International Law* (1942) ................................. 35

4 John Bassett Moore, *A Digest of International Law* (1906) ............................................. 35

31 Op. O.L.C. 73 (Apr. 16, 2007) ..................................................... 50

Daniel J. Ryan, *A History of Ohio, with Biographical Sketches of Her Governors and the
Ordinance of 1787 (*1888) ............................................................. 44

3 Joseph Story, *Commentaries on the Constitution of the United States* (1833) ..................... 18

White House Statement (Aug. 31, 2016),
https://go.usa.gov/xP2ZG .............................................................. 8

The White House, *Puerto Rico Hill Update—Humanitarian Crisis*
(Apr. 19, 2016), https://go.usa.gov/xPW4d ....................................... 5, 6

# INTRODUCTION

By the summer of 2016, the Commonwealth of Puerto Rico faced an economic emergency more severe and debilitating than any in its history. The Commonwealth and its instrumentalities together carried more debt than the entire annual output of Puerto Rico's economy. Their credit ratings had been downgraded to junk, and they could not obtain debt relief through the federal Bankruptcy Code. Worse still, the Commonwealth's financial crisis was precipitating a humanitarian crisis for the more than 3 million U.S. citizens on the island. Hospitals were turning away patients; schools were closing their doors; public pension funds were grossly underfunded. "[T]he Commonwealth's very ability to persist" was in doubt. *Wal-Mart Puerto Rico, Inc. v. Zaragoza-Gomez*, 174 F. Supp. 3d 585, 592 (D.P.R.), *aff'd*, 834 F.3d 110 (1st Cir. 2016).

Congress passed the Puerto Rico Oversight, Management, and Economic Stability Act (PROMESA) to address these existential threats. *See* Pub. L. No. 114-187, 130 Stat. 549 (2016). Exercising its plenary power under Article IV of the Constitution to shape and define territorial governments, PROMESA established a new Financial Oversight and Management Board (Board) as an entity "within the territorial government" of Puerto Rico. 48 U.S.C. § 2121(c)(1). PROMESA empowered and directed the Board to help the Commonwealth "achieve fiscal responsibility and access to the capital markets." *Id.* § 2121(a). In Title III of PROMESA, Congress further established a debt-restructuring procedure for territorial governments and

instrumentalities.  Five such proceedings are currently pending, involving tens of thousands of creditors and total debt in excess of $50 billion.

Appellants are creditors of the Commonwealth and its instrumentalities.  They argue that the Board is invalidly constituted; that all of the restructuring proceedings initiated by the Board must be dismissed; and that the associated automatic stays must be lifted.  This is so, appellants contend, because the members of the Board were appointed in violation of the Appointments Clause of the Constitution, which specifies the required manner of appointment for officials who qualify as "Officers of the United States."  U.S. Const. art. II, § 2, cl. 2.

As the district court ruled, appellants' argument rests on the mistaken premise that the Appointments Clause constrains Congress's plenary power to provide for the governance of the Nation's territories.  The Supreme Court has long recognized that, when Congress establishes territorial governments, it "is not subject to the same restrictions which are imposed in respect of laws for the United States considered as a political body of states in union."  *Cincinnati Soap Co. v. United States*, 301 U.S. 308, 323 (1937).  For over two centuries, Congress has provided for the government of territories in ways that the Appointments Clause would not abide—most notably, by allowing citizens of the territories to choose their own leaders through democratic elections.

The district court rightly recognized that, if appellants' understanding of the Appointments Clause were correct, self-government in the territories would likewise violate the Constitution.  If Board members were officers of the United States because

of the significant powers they wield, so too would be the governor of Puerto Rico and members of the Puerto Rico legislature, who are elected by the people of Puerto Rico to write, enact, and enforce laws governing the lives of millions of Americans. But elections are not among the mechanisms of appointment authorized by the Appointments Clause. The import of appellants' theory, therefore, is that territorial home rule is unconstitutional. Although appellants now disclaim that result, they identify no principled basis for an "elections" exception to the Clause. The reason democratically elected territorial governments do not violate the Appointments Clause is because the Clause does not constrain Congress's authority to establish territorial governments.

Appellants also argue that, even if the Appointments Clause does not apply to territorial governments, the Board is not actually part of the government of Puerto Rico. That contention is equally meritless. Congress enjoys broad constitutional authority to organize territorial governments as it chooses, and it specified in PROMESA that the Board shall be an entity "within the territorial government" of Puerto Rico. 48 U.S.C. § 2121(c)(1). Appellants identify no proper basis to disregard that congressional judgment. The Board's structure and powers, moreover, are fully consistent with its territorial character, and with those of other territorial governments created by Congress throughout the Nation's history.

## STATEMENT OF JURISDICTION

These appeals arise from Title III restructuring proceedings initiated in the U.S. District Court for the District of Puerto Rico. *See* 48 U.S.C. § 2166(a)(1). The government concurs with appellants Aurelius and Assured that this Court has jurisdiction over Nos. 18-1746 and 18-8014, *see* Aurelius Br. 5-6, and with Appellant Unión de Trabajadores de la Industria Eléctrica y Riego de Puerto Rico, Inc. (UTIER) that this Court has jurisdiction over No. 18-1787.[1] The government notes that this Court lacks jurisdiction over No. 18-1671, an appeal noticed by the Aurelius appellants before the district court had certified the challenged order for interlocutory review as required by 48 U.S.C. § 2166(e)(3). The Court need not address this issue because No. 18-8014, over which this Court does have jurisdiction, concerns the same order.

## STATEMENT OF THE ISSUE

Congress established the Financial Oversight and Management Board as an entity "within the territorial government" of the Commonwealth of Puerto Rico. 48 U.S.C. § 2121(c)(1). The question presented is whether the members of the Board are nonetheless "Officers of the United States" under the Appointments Clause.

---

[1] The district court rejected the Board's argument that UTIER lacked standing to bring its adversary complaint. The United States took no position on that question.

# STATEMENT OF THE CASE

## I.   Statutory Background

**A.**   Congress enacted PROMESA to address the worst fiscal crisis in Puerto

Rico's history.   By July 2016, the Commonwealth and its instrumentalities had an

outstanding debt of approximately $72 billion, and neither the Commonwealth nor its

instrumentalities could secure external funding or obtain adequate access to the capital

markets. *See* Government Development Bank for Puerto Rico, *Commonwealth of Puerto*

*Rico Financial Information and Operating Data Report* 52, 67-68 (Dec. 18, 2016),

https://go.usa.gov/xPZ2e.   And the Supreme Court had recently held that a

Commonwealth law creating a debt-restructuring procedure for Puerto Rico

municipalities was preempted by the U.S. Bankruptcy Code. *Puerto Rico v. Franklin*

*California Tax-Free Trust*, 136 S. Ct. 1938, 1946 (2016).   As a result, "the

Commonwealth's very ability to persist" was in doubt. *Wal-Mart Puerto Rico, Inc. v.*

*Zaragoza-Gomez*, 174 F. Supp. 3d 585, 592 (D.P.R.), *aff'd*, 834 F.3d 110 (1st Cir. 2016).

This financial crisis threatened dire consequences for the more than 3 million

U.S. citizens who reside in Puerto Rico.   Hospitals were forced to reduce patient

capacity and to lay off their employees; hundreds of schools closed their doors; the

largest university reduced its services; and funds to pay public pensions were projected

to be depleted in three years.   The White House, *Puerto Rico Hill Update—Humanitarian*

*Crisis* 2-4 (Apr. 19, 2016), https://go.usa.gov/xPW4d.   Government suppliers, who

were collectively owed nearly $2 billion, threatened to halt ongoing infrastructure

projects and to cut off essential services to the island—such as the provision of gasoline to police and fire departments. *Id.* at 3.

**B.**    Congress passed PROMESA to resolve this "fiscal emergency" and arrest the island's "severe economic decline." 48 U.S.C. § 2194(m)(1). As the statute declares, PROMESA was enacted pursuant to Congress's plenary power to "dispose of and make all needful Rules and Regulations respecting the Territory . . . belonging to the United States." U.S. Const. art. IV, § 3, cl. 2; *see* 48 U.S.C. § 2121(b)(2) ("Constitutional basis").

PROMESA embodies a "comprehensive approach" to Puerto Rico's economic recovery. 48 U.S.C. § 2194(m)(4). The centerpiece of that approach is the Financial Management and Oversight Board, which Congress created to provide independent oversight of Puerto Rico's financial affairs. Congress established the Board as an entity "within the territorial government" of Puerto Rico, *id.* § 2121(c)(1), and charged it with helping Puerto Rico "achieve fiscal responsibility" and with ensuring Puerto Rico's "access to the capital markets," *id.* § 2121(a).[2]

Congress vested the Board with extensive authority over Puerto Rico's fiscal policy, including the power to approve fiscal plans and budgets for the Commonwealth and its instrumentalities, 48 U.S.C. §§ 2141-2142; to enforce compliance with these

---

[2] The Board's structure is derived from the successful model of the District of Columbia Control Board, which was likewise established within the government of the District and composed of members appointed by the President without Senate confirmation. *See* District of Columbia Financial Responsibility and Management Assistance Act of 1995, Pub. L. No. 104-8, 109 Stat. 97.

plans and budgets, *id.* §§ 2143-2144; and to supervise the issuance, guarantee, and modification of Puerto Rico's debts, *id.* § 2147. The Board's activities will end once the Commonwealth has reestablished adequate access to credit markets at reasonable interest rates, and has balanced its budget for four consecutive years. *See id.* § 2149.

In Title III of PROMESA, Congress also created a debt-restructuring procedure for territorial governments and their instrumentalities. The Board serves as Puerto Rico's sole representative in Title III proceedings, 48 U.S.C. § 2175(b), and is empowered to "take any action necessary on behalf of the debtor to prosecute the case of the debtor," *id.* § 2175(a). The Board is the only entity authorized to propose a debt-adjustment plan on behalf of Puerto Rico and its instrumentalities. *Id.* § 2172(a).

**C.** The Board has seven voting members. 48 U.S.C. § 2121(e)(1). The Governor of Puerto Rico, or the governor's designee, is an *ex officio* nonvoting member. *Id.* § 2121(e)(3). Each voting member serves a three-year term and may be removed by the President "only for cause." *Id.* § 2121(e)(5)(A)-(B).

All seven voting members are appointed by the President. One may be selected by the President at his sole discretion. 48 U.S.C. § 2121(e)(2)(A)(vi). The statute provides that the remainder "should" be selected from lists of candidates provided by congressional leadership. *Id.* § 2121(e)(2)(A)(i)-(v). If dissatisfied, however, the President may request that the lists be supplemented, *id.* § 2121(e)(2)(C), and may also appoint individuals who are not on the lists with the advice and consent of the Senate, *id.* § 2121(e)(2)(E). "[N]o Senate confirmation is required" if "the President appoints

an individual from a list." *Id.* Recognizing that the crisis in Puerto Rico demanded an urgent response, Congress further provided that, in the event that the President did not appoint any voting member by September 1, 2016, the President was required to appoint, by September 15, 2016, an individual from the lists provided. *See id.* § 2121(e)(2)(G).

## II. Factual Background

Congress passed PROMESA quickly and with strong bipartisan support. On June 30, 2016, President Obama signed PROMESA into law. PROMESA's enactment triggered an "immediate" but "temporary" stay of certain liability claims against the Commonwealth of Puerto Rico. 48 U.S.C. §§ 2194(b), (m).

In August 2016, President Obama appointed all seven voting members of the Board. *See* White House Statement (Aug. 31, 2016), https://go.usa.gov/xP2ZG. One member was selected at the President's sole discretion; the remaining six were selected from the congressionally provided lists. *See id.* The President did not request that the lists be supplemented before the appointments were made, nor did he invoke his prerogative to nominate any other candidate for appointment with the advice and consent of the Senate.

In May 2017, the Board initiated a Title III proceeding on behalf of the Commonwealth in federal district court in Puerto Rico, and shortly thereafter, four additional Title III proceedings on behalf of Puerto Rico governmental

instrumentalities.  *See* ADD-10.[3]  To date, although some tentative settlements have been announced, the Board has not proposed a plan of adjustment for any of the Title III debtors.  Creditors have filed approximately 172,000 proofs of claim in those proceedings, which together involve debt in excess of $50 billion.

## III.    Procedural Background

In August 2017, the Aurelius appellants—hedge funds that hold outstanding bonds issued by the Commonwealth—moved to dismiss the Commonwealth's Title III proceeding, arguing that the Board's members were appointed in violation of the Appointments Clause and therefore lacked authority to file a Title III petition on Puerto Rico's behalf.

The district court rejected these arguments.  As the court explained, the Supreme Court has long held that "Congress has plenary power . . . to establish governmental institutions for territories that are not only distinct from federal government entities but [that] include features that would not comport with the requirements of the Constitution if they pertained to the governance of the United States."  ADD-21. Because "the Oversight Board is a territorial entity and its members are territorial officers," ADD-33, the court found "no constitutional defect in the method of appointment provided by Congress" for the Board's members, ADD-34.  And because "the alleged defect in the appointment method [was] the only ground upon which" the

---

[3] Citations in this format refer to the addendum to Aurelius's brief.

movants had challenged the Board's constitutionality, the district court denied the motion to dismiss the Title III proceeding. *Id.*

The court also dismissed two adversary complaints raising identical issues: a complaint filed by UTIER in the Title III proceeding initiated on behalf of the Puerto Rico Electric Power Authority; and a complaint filed by Assured in both the Commonwealth's Title III proceeding and the Title III proceeding initiated on behalf of the Puerto Rico Highways & Transportation Authority.

## SUMMARY OF ARGUMENT

Like the elected governor and legislature of Puerto Rico, the members of the Board are officers of the territorial government whose appointment is not governed by the Appointments Clause. When legislating with respect to a territory, Congress "has the entire dominion and sovereignty, national and local, Federal and state." *Simms v. Simms*, 175 U.S. 162, 168 (1899). Accordingly, Congress may act in a manner "that would exceed its powers, or at least would be very unusual, in the context of national legislation enacted under other powers delegated to it." *Palmore v. United States*, 411 U.S. 389, 398 (1973). By vesting plenary authority in Congress in this manner, the Framers left Congress free "to develop innovative approaches to territorial governance" tailored to each territory's unique needs. *Puerto Rico v. Sanchez Valle*, 136 S. Ct. 1863, 1876 (2016).

The Appointments Clause has never constrained Congress's authority to establish territorial governments. The Supreme Court has repeatedly made clear that standard separation-of-powers principles do not apply to the territories. The Court has

held, for example, that the powers of territorial legislatures cannot be attacked on structural non-delegation grounds, and that territorial judges need not enjoy the assurances of judicial independence provided by Article III. And although the Supreme Court has not directly addressed the Appointments Clause, it has recognized that territorial judges—who, like Article III judges, may "decide all cases arising under the Constitution and laws of the United States"—may permissibly be "elected by the people of [a] Territory." *Clinton v. Englebrecht*, 80 U.S. (13 Wall.) 434, 447 (1871). That conclusion is impossible to reconcile with the Appointments Clause's requirements.

Just as telling is the 200-year history of federal legislation conferring upon the territories various degrees of self-governance and democratic self-determination. That tradition dates back to the Northwest Ordinance of 1787, which provided for an elected house of representatives to enact laws for the Nation's first territory. A related tradition of allowing territorial officials to appoint *other* territorial officials dates back at least as far as 1812. At every moment since its creation in 1900, Puerto Rico's territorial government has featured one or both of these traditions. And in the nearly seventy years since Congress enacted legislation approving Puerto Rico's constitution establishing a self-governing Commonwealth, *none* of Puerto Rico's territorial officials—including its elected governor, its legislature, and the justices of its Supreme Court—has taken office as the Appointments Clause would require.

The district court correctly concluded that the Appointments Clause has no more relevance to the appointment of Board members than it does to the appointment of

any other official of the Puerto Rico government. Congress established the Board as a new entity "within the territorial government" of Puerto Rico to address a territorial crisis of unprecedented proportions, and its structure and powers reflects its territorial character. 48 U.S.C. § 2121(c)(1).

Appellants' counterarguments lack merit. Appellants principally contend that, for purposes of the Appointments Clause, territorial officials are no different from officers such as Article III judges and the Secretary of Defense. But that contention implies the invalidity of territorial home rule as well: if a Board member is a principal officer, the elected governor of Puerto Rico must be too. Recognizing the absurdity of this conclusion, appellants posit that elected territorial officials are not subject to the Appointments Clause because they exercise not the sovereignty of the United States, but the sovereignty of the territory's people. But appellants have no textual basis for their "elections" exception to the Appointments Clause, and they ignore that the citizens of the Commonwealth are empowered to elect their own governor and legislature only because Congress enacted legislation allowing them to do so.

Appellants also attempt to rewrite over two centuries of territorial history. They contend that the Appointments Clause must apply to territorial officials because many were appointed in the same manner that the Clause requires. But many others took office in a manner the Clause forbids. And some were initially appointed pursuant to Appointments Clause procedures before Congress decided that such procedures were no longer appropriate. Properly understood, appellants' historical examples only

underscore the flexibility that Congress enjoys in devising solutions for territorial governance. Congress has chosen presidential nomination and Senate confirmation for some territorial officers as a matter of policy, not constitutional necessity.

Appellants next contend that, if the Appointments Clause *did* apply to the Board, PROMESA's appointment provisions would violate it. The United States agrees that, if the Clause applied to a territorial entity like the Board, the Board's members—like the governor, legislators, and justices of Puerto Rico—would likely be principal officers whose appointments would require presidential nomination and Senate confirmation. But because the Clause does not constrain Congress's discretion in creating territorial governments, this Court need not decide that question. For the same reason, the Court does not need to decide whether, if the Appointments Clause applied, PROMESA's appointment provisions impermissibly aggrandize Congress's power at the Executive's expense.

Finally, appellants contend that, notwithstanding Congress's declaration that the Board is an organ of Puerto Rico's territorial government, this Court should refuse to respect that congressional judgment and should instead determine that the Board is a conventional federal agency. This claim is meritless. Congress has broad authority to prescribe the form and organization of territorial governments. To enable Puerto Rico to address the fiscal (and looming humanitarian) crisis on the island, Congress established the Board as a new agency of the Commonwealth of Puerto Rico and

imbued it with powers to supervise the Commonwealth's finances. Appellants identify no proper basis to second-guess that legislative judgment.

## STANDARD OF REVIEW

This Court reviews constitutional challenges to federal statutes de novo. *See United States v. Cardoza*, 129 F.3d 6, 10 (1st Cir. 1997).

## ARGUMENT

As a matter of constitutional text, settled Supreme Court precedent, and longstanding historical practice, the Oversight Board is an entity of the territorial government that is not subject to the Appointments Clause. The Constitution's basic distinction between offices of the United States Government established by Congress pursuant to its Article I powers and offices of a territorial government created by Congress pursuant to its plenary Article IV power has persisted from the beginning of the Republic. Since 1787, Congress has provided for the selection of territorial officials through means that the Appointments Clause would not abide and that have never been thought to pose any constitutional difficulty—for example, by means of direct election. Here, Congress left no doubt that it was exercising its Article IV plenary power over the territory of Puerto Rico by specifying in PROMESA that it was doing so, and by locating the Board within the Puerto Rico government, not the national government.

# I. The Oversight Board Is A Territorial Entity Whose Members Are Not Subject To The Appointments Clause.

## A. The Appointments Clause does not constrain Congress's plenary authority to establish and structure territorial governments.

The district court correctly ruled that the members of the Oversight Board are territorial officers to whom Appointments Clause procedures do not apply. That Clause establishes the appointment mechanism for "Officers of the United States" for whom the Constitution does not otherwise prescribe a method of appointment. U.S. Const. art. II, § 2, cl. 2. For purposes of the Appointments Clause, an "Officer[]" is an individual who exercises "significant authority pursuant to the laws of the United States" and holds an office "established by [l]aw." *Buckley v. Valeo*, 424 U.S. 1, 125-26 (1976) (per curiam); *see Lucia v. SEC*, 138 S. Ct. 2044, 2051 (2018). Principal officers must be appointed by the President with the advice and consent of the Senate. Inferior officers must be appointed in the same way, except where Congress has instead by law vested their appointments "in the President alone, in the Courts of Law, or in the Heads of Departments." U.S. Const. art. II, § 2, cl. 2.

That two-tiered system, however, applies only to "Officers *of the United States.*" When Congress establishes a territorial-government office pursuant to its plenary power under Article IV to make "needful Rules and Regulations respecting [a] Territory," U.S. Const. art. IV, § 3, cl. 2, Congress is not creating an officer of the United States—*i.e.*, an officer within the Executive or Judicial Branch who is part of the

federal government and subject to the strictures of Article II or III. Rather, Congress is creating an officer of the territorial government whose authority derives from Congress's Article IV authority over the territory. *See, e.g.*, *Clinton v. Englebrecht*, 80 U.S. (13 Wall.) 434, 447 (1871) ("The judges of the Supreme Court of the territory are appointed by the president under the act of congress, but this does not make the courts they are authorized to hold courts of the United States."). Appellants therefore miss the point (Aurelius Br. 19-26) by skipping straight to *Buckley*'s significant-authority test. The Supreme Court has applied that test to traditional Executive Branch or Judicial Branch officers, but it has never applied that test to territorial officers. To the contrary, as explained below, the Supreme Court has repeatedly held that structural constraints on the exercise of Congress's Article I powers (like the Appointments Clause) do not apply to Congress's exercise of its plenary Article IV power over the territories.

The Constitution grants Congress "plenary power . . . over the territories of the United States." *El Paso & Ne. Ry. Co. v. Gutierrez*, 215 U.S. 87, 93 (1909). When legislating for a territory, "Congress has the entire dominion and sovereignty, national and local, Federal and state." *Simms v. Simms*, 175 U.S. 162, 168 (1899); *accord American Ins. Co. v. 356 Bales of Cotton*, 26 U.S. (1 Pet.) 511, 512 (1828) (Marshall, C.J.). And Congress's authority extends to all "people of the [t]erritories" and "all departments of the territorial governments." *National Bank v. County of Yankton*, 101 U.S. 129, 133 (1879). As the district court recognized, by vesting Congress with comprehensive and exclusive control of territorial governance, the Framers permitted Congress to legislate

16

for the territories in a manner "that would exceed its powers, or at least would be very unusual, in the context of national legislation enacted under other powers delegated to it." *Palmore v. United States*, 411 U.S. 389, 398 (1973); *see* ADD-14–17. This flexible approach frees Congress "to develop innovative approaches to territorial governance" that are tailored to each territory's needs. *Puerto Rico v. Sanchez Valle*, 136 S. Ct. 1863, 1876 (2016).

When governing the territories, Congress exercises "full legislative power over all subjects upon which the legislature of a state might legislate within the state." *Simms*, 175 U.S. at 168. Sometimes, Congress exercises that authority by legislating for the territories directly. In 1952, for example, Congress deleted substantive provisions from a proposed constitution approved by the citizens of Puerto Rico, and prohibited their reenactment in the future. *See* 66 Stat. 327 (1952); *Sanchez Valle*, 136 S. Ct. at 1868-69. More often, Congress has provided for the local election and self-maintenance of territorial governments. These governments are "not organized under the Constitution," *Benner v. Porter*, 50 U.S. (9 How.) 235, 242 (1850), in the sense that they are not subject to the intricate checks and balances that the Framers imposed on the national government. Territorial governments are instead "the creations, exclusively, of the legislative department." *Id.*

Just as state governments need not be organized in conformity with the federal government's tripartite structure, territorial governments need not be organized as if they were "subject to" the Constitution's "complex distribution of the powers of

government." *Benner*, 50 U.S. at 242. "Having a right to erect a territorial government, [Congress] may confer on it such powers, legislative, judicial, and executive, as they may deem best." 3 Joseph Story, *Commentaries on the Constitution of the United States* § 1319, at 195 (1833).

That discretion is possible because the Vesting Clauses of Articles I, II, and III of the Constitution do not constrain the structure of territorial governments. Structural constraints like the Appointments Clause are designed to protect the separation of powers among Congress, the President, and the Judiciary. But those concerns simply are not implicated in the same way when Congress is exercising its plenary power over the territories. Indeed, it is well settled that Congress may vest legislative, executive, and judicial power in territorial governments in ways that "would be incompatible with the Vesting Clauses of the Federal Constitution if those Clauses applied." *Ortiz v. United States*, 138 S. Ct. 2165, 2197 (2018) (Alito, J., dissenting) (collecting cases). For example, Congress "may endow territorial governments with a plural executive; it may allow the executive to legislate; it may dispense with the legislature or judiciary altogether." *Freytag v. Commissioner*, 501 U.S. 868, 914 (1991) (Scalia, J., concurring). These choices are "at all times subject to such alterations as Congress may see fit to adopt." *Snow v. United States*, 85 U.S. (18 Wall.) 317, 320 (1873).

For these reasons, the Supreme Court has consistently turned aside efforts by litigants to superimpose the structural requirements for the federal government on the organization of territorial governments. For example:

- Congress may empower elected territorial legislatures to enact laws—including criminal laws governing the primary conduct of U.S. citizens—without regard for non-delegation principles.[4]

- Territorial judges need not possess the tenure and salary protections of Article III, even though they may be granted power to enforce all federal civil and criminal laws and to issue judgments with binding effect.[5]

- Congress may vest power to issue indictments and writs in territorial prosecutors over whom the President has no control, even where their exercise of prosecutorial power precludes later prosecutions by the U.S. Department of Justice.[6]

In these and other ways, the Supreme Court has protected Congress's discretion under Article IV to "develop innovative approaches to territorial governance" that address each territory's unique needs—for example, the severe financial crisis that confronted Puerto Rico in 2016. *Sanchez Valle*, 136 S. Ct. at 1876.

Against this backdrop, the anomaly of appellants' attempt to superimpose the strictures of the Appointments Clause on the government of Puerto Rico is plain. The vital role of the Appointments Clause in the constitutional separation of powers among the three Branches of the United States Government is unquestioned. But appellants do not offer any justification for importing the Appointments Clause into territorial

---

[4] *Dorr v. United States*, 195 U.S. 138, 142-43 (1904); *Cincinnati Soap Co. v. United States*, 301 U.S. 308, 322-23 (1937).

[5] *Palmore*, 411 U.S. at 403 (holding that Article III does not apply to the courts of the District of Columbia); *American Ins. Co.*, 26 U.S. at 546 (holding that Congress may vest judicial power in courts created by the territorial legislature); *Kendall v. United States ex rel. Stokes*, 37 U.S. (12 Pet.) 524, 619 (1838) (same).

[6] *Snow*, 85 U.S. at 321-22; *Sanchez Valle*, 136 S. Ct. at 1876-77.

governance that would not apply equally to constitutional non-delegation principles or to the tenure and salary protections of Article III.

Indeed, as the district court recognized, although the Supreme Court has not squarely addressed whether the Appointments Clause applies to territorial governments, its decisions concerning territorial courts strongly suggest that the Clause does not apply. ADD-17–18. The Court has explained that Congress may "clothe" territorial judges with the power "to decide all cases arising under the Constitution and laws of the United States." *Englebrecht*, 80 U.S. at 447. There can be no serious dispute that a territorial judge vested with that power satisfies appellants' test: he occupies a continuing office and wields significant authority. After all, when that same authority is wielded by an adjudicative officer in the Executive Branch, it triggers the requirements of the Appointments Clause. *See Lucia*, 138 S. Ct. at 2049 (SEC administrative law judges are "inferior Officers" under the Appointments Clause); *cf. Freytag*, 501 U.S. at 881-82 (special trial judges of the Tax Court are "inferior Officers"). Yet in the same breath, the Supreme Court has explained that territorial judges may, if Congress chooses, be "elected by the people of the Territory[] and commissioned by the [territorial] governor." *Englebrecht*, 80 U.S. at 447. That result is impossible to square with appellants' understanding of the Appointments Clause.

**B.** **Historical practice confirms that the Appointments Clause does not constrain the selection of territorial officials.**

The history of territorial governance underscores that the Appointments Clause does not constrain the selection of territorial officials. Since the Founding, Congress has provided for the selection of territorial-government officials vested with significant authority. Yet Congress has never understood itself to be constrained by the Appointments Clause in providing for the selection of those officials. From the Northwest Ordinance to the present, Congress has often provided for the direct local election of territorial officials who would otherwise qualify as "Officers of the United States." That extensive historical practice is by itself compelling evidence that appellants' argument cannot be correct. *See, e.g.*, *NLRB v. Noel Canning*, 134 S. Ct. 2550, 2559 (2014) (emphasis omitted) (citing *M'Culloch v. Maryland*, 17 U.S. (4 Wheat.) 316, 401 (1819)) (explaining that "historical practice" under the Constitution warrants "significant weight" in determining the meaning of the Constitution).

**1.** **Every major United States territory today is governed in a manner that would be inconsistent with the Appointments Clause.**

Every major U.S. territory today is governed by officials of a territorial government elected by the people of that territory. The Commonwealth of Puerto Rico is illustrative. As this Court knows well, in 1950 Congress passed legislation inviting the people of Puerto Rico to "organize a government pursuant to a constitution of their own adoption." *Sanchez Valle*, 136 S. Ct. at 1876 (quoting 64 Stat. 319, 319 (1950)).

The new constitution was drafted by a convention whose members were popularly elected; the constitution itself was approved by plebiscite. Congress ultimately passed legislation approving that constitution (subject to several revisions), and authorizing it to take legal effect. *See* 66 Stat. 327 (1952).

Since that time, Puerto Rico has operated as "an autonomous political entity, sovereign over matters not ruled by the [federal] Constitution." *Rodriguez v. Popular Democratic Party*, 457 U.S. 1, 8 (1982) (quotation marks omitted). The Commonwealth's governor, who is directly elected by the people of Puerto Rico, wields "[t]he executive power" and is charged with "execut[ing] the laws and caus[ing] them to be executed." P.R. Const. art. IV, §§ 1, 4. And the Commonwealth's legislature, whose members are also elected, wields "[t]he legislative power" to enact civil and criminal laws. *Id.* art. III, § 1. If the Appointments Clause constrained the appointment of territorial officials, there is little doubt that the governor and legislators of the Commonwealth would require appointment as "Officers of the United States." The governor has sole responsibility, unsupervised by any officer of the Executive Branch, to execute the laws of Puerto Rico. The legislature devises laws—including criminal laws—that regulate the primary conduct of millions of U.S. citizens in every facet of life. Yet the governor and all of the Commonwealth's legislators are elected by the people of Puerto Rico. None of this would be permissible under the Appointments Clause on appellants' view.

Congress has provided for popularly elected territorial officials elsewhere as well. Guam and the Virgin Islands have held gubernatorial elections since 1968. *See* Guam

Elective Governor Act, Pub. L. No. 90-497, 82 Stat. 842 (1968); Virgin Islands Elective Governor Act, Pub. L. No. 90-496, 82 Stat. 837 (1968). American Samoa has held gubernatorial elections since 1977. *See* 42 Fed. Reg. 48,398 (Sept. 23, 1977). And the Northern Mariana Islands have held gubernatorial elections since 1986. *See* 51 Fed. Reg. 40,399 (Nov. 7, 1986).

Furthermore, popular elections are not the only way in which territorial governments depart from the Appointments Clause. Congress has also authorized elected territorial officials to appoint *other* important territorial officials without any oversight by the United States Government. For example, the Governor of Puerto Rico appoints the Secretary of Justice (the Commonwealth's chief law-enforcement officer) and the Justices of the Puerto Rico Supreme Court with the advice and consent of the Puerto Rico Senate, and appoints the Secretary of State with the advice and consent of the entire Puerto Rico legislature. P.R. Const. art. IV, §§ 5-6; *id.* art. V, § 8. Similarly, the governors of Guam and the Virgin Islands "shall appoint, and may remove, all officers and employees of the executive branch of the [territorial] government." 82 Stat. at 843 (Guam); 82 Stat. at 838 (Virgin Islands). Needless to say, the Appointments Clause would not permit Congress to adopt this method of appointing officials either.

## 2. The tradition of territorial popular elections dates to the beginning of the Republic.

These flexible approaches to the structure of territorial governments are not contemporary inventions. Congress has provided for the governance of the Nation's territories in this manner for over two centuries.

The tradition of territorial self-determination dates back to the Northwest Ordinance of 1787, which the Confederation Congress enacted to govern the Nation's first territory before the Constitution was ratified. The Ordinance provided for the creation of an elected house of representatives once the Northwest Territory had five thousand eligible voters. Act of Aug. 7, 1789, ch. 8, 1 Stat. 50, 51 n.(a) (reprinting 1787 Ordinance in footnote). After the Constitution was ratified, the First Congress amended the Ordinance to clarify the relationship of the territorial government to the newly created Executive Branch. *Id.* at 52-53; *see* David P. Currie, *The Constitution in Congress: The Federalist Period, 1789-1801*, at 106 (1997). These amendments provided that certain territorial officials previously appointed by Congress alone would instead be appointed by the President with the advice and consent of the Senate. 1 Stat. at 53. But Congress retained every other aspect of the original Ordinance—including the provisions establishing a popularly elected territorial legislature.

Following the Northwest Ordinance's example, Congress created an elected legislature in the vast majority of territories for which it established a government.[7] These legislatures, like the house of representatives of the Northwest Territory, could exercise full legislative power for the territories. *See, e.g.*, 5 Stat. 10, 12 (1836) ("The legislative power of the [Wisconsin] Territory shall extend to all rightful subjects of legislation."). The power to adopt laws that regulate the primary conduct of U.S. and territorial citizens is a quintessential example of significant governmental authority— authority that, if exercised by an official of the United States Government, would trigger the requirements of the Appointments Clause. Yet Congress has provided for directly elected territorial legislatures since the beginning of the Republic.

For nearly as long, moreover, Congress has permitted elected territorial officials to appoint *other* territorial officials. This method of appointment dates back at least as far as 1812, when Congress gave the governor of the Missouri Territory the "power to

---

[7] *See* 1 Stat. 123, 123 (1790) (Southwest Territory); 1 Stat. 549, 550 (1798) (Mississippi); 2 Stat. 58, 59 (1800) (Indiana); 2 Stat. 309, 309 (1805) (Michigan); 2 Stat. 322, 322 (1805) (Orleans); 2 Stat. 514, 515 (1809) (Illinois); 2 Stat. 743, 745 (1812) (Missouri); 3 Stat. 371, 372 (1817) (Alabama); 3 Stat. 493, 494 (1819) (Arkansas); 4 Stat. 332, 333 (1829) (Florida); 5 Stat. 10, 12 (1836) (Wisconsin); 5 Stat. 235, 236-37 (1838) (Iowa); 9 Stat. 323, 324 (1848) (Oregon); 9 Stat. 403, 404-05 (1849) (Minnesota); 9 Stat. 446, 448 (1850) (New Mexico); 9 Stat. 453, 454 (1850) (Utah); 10 Stat. 172, 173-74 (1853) (Washington); 10 Stat. 277, 278-79, 284-85 (1854) (Nebraska and Kansas); 12 Stat. 172, 173 (1861) (Colorado); 12 Stat. 209, 211 (1861) (Nevada); 12 Stat. 239, 240 (1861) (Dakota); 12 Stat. 664, 665 (1863) (Arizona); 12 Stat. 808, 810 (1863) (Idaho); 13 Stat. 85, 87 (1864) (Montana); 15 Stat. 178, 179 (1868) (Wyoming); 26 Stat. 81, 83-84 (1890) (Oklahoma); 31 Stat. 141, 144 (1900) (Hawaii); 37 Stat. 512, 513 (1912) (Alaska).

appoint and commission all officers civil and of the militia." 2 Stat. 743, 744 (1812). In 1836, when Congress created the Wisconsin Territory, it expressly allowed the governor to appoint judicial officers, justices of the peace, and sheriffs as well. *See* 5 Stat. at 11, 13. Congress adopted similar appointment provisions in the organic acts governing at least eighteen other territories.[8]

### 3. The territorial government of Puerto Rico has never been appointed in conformity with the requirements of the Appointments Clause.

The history of territorial government in Puerto Rico underscores the point. Puerto Rico became a territory of the United States in 1898, following the Spanish-American War. *Sanchez Valle*, 136 S. Ct. at 1868. Since that time, Congress has authorized various forms of government on the island. At no point has any of those governments been entirely appointed in the manner outlined in the Appointments Clause.

Congress established Puerto Rico's first civil government in 1900, soon after the United States acquired the island. *See* Foraker Act, ch. 191, 31 Stat. 77 (1900). As initially structured, many territorial officials, including the governor, were to be

---

[8] *See* 3 Stat. 493, 494-95 (1819) (Arkansas); 5 Stat. 235, 237 (1838) (Iowa); 9 Stat. 323, 330 (1848) (Oregon); 9 Stat. 403, 405 (1849) (Minnesota); 9 Stat. 446, 449 (1850) (New Mexico); 9 Stat. 453, 455 (1850) (Utah); 10 Stat. 172, 175-76 (1853) (Washington); 10 Stat. 277, 279-80 (1854) (Nebraska); 10 Stat. at 286 (1854) (Kansas); 12 Stat. 172, 174 (1861) (Colorado); 12 Stat. 209, 212 (1861) (Nevada); 12 Stat. 239, 241 (1861) (Dakota); 12 Stat. 664, 665 (1863) (Arizona); 12 Stat. 808, 811 (1863) (Idaho); 13 Stat. 85, 88 (1864) (Montana); 15 Stat. 178, 180 (1868) (Wyoming); 26 Stat. 81, 85 (1890) (Oklahoma); 31 Stat. 141, 156 (1900) (Hawaii).

appointed by the President with the advice and consent of the Senate. From the outset, however, Congress vested "all local legislative powers . . . in a legislative assembly which shall consist of two houses," including a "house of delegates" whose members were elected by qualified citizens of Puerto Rico. *Id.* §§ 27-29. Congress provided that these elected officials had authority to act on "all matters of a legislative character not locally inapplicable." *Id.* § 32.

Congress eventually conferred greater autonomy upon Puerto Rico in the Jones Act, 39 Stat. 951, 955-56 (1917). That Act provided that, while the governor and two heads of departments were to be appointed by the President with the advice and consent of the Senate, the remaining department heads were to be appointed by the governor, and the territorial legislature would continue to be directly elected. *Id.* In 1947, Congress for the first time authorized the governor to be elected by the citizens of Puerto Rico, and it gave elected territorial officials the power to appoint every head of every executive department. *See* 61 Stat. 770 (1947). Finally, in 1952, Congress created the Commonwealth of Puerto Rico. Since that time, *none* of Puerto Rico's officials has taken office in a manner that would satisfy the Appointments Clause.

### C. Congress established the Oversight Board as an organ of the Puerto Rico territorial government.

Like other organs of the Puerto Rico government, the Oversight Board is a territorial entity whose members are not subject to the Appointments Clause. Congress specifically provided in PROMESA that the Board shall be an entity "within the

territorial government" of Puerto Rico and that it "shall not be considered to be a department, agency, establishment, or instrumentality of the Federal Government." 48 U.S.C. § 2121(c)(1). Congress further declared that, in enacting PROMESA, it exercised its authority "to dispose of and make all needful rules and regulations for territories." *Id.* § 2121(b)(2). The Supreme Court has consistently respected Congress's statutory pronouncements that it is acting pursuant to its plenary Article IV authority. *See, e.g., Palmore*, 411 U.S. at 407; *Cincinnati Soap Co. v. United States*, 301 U.S. 308, 323 (1937); *Binns v. United States*, 194 U.S. 496, 494 (1904).

The Board's mandate and structure reflect its territorial character. When Congress enacted PROMESA, Puerto Rico was unable to meet its crushing debt obligations, and its ability to provide essential services to its citizens was in jeopardy. 48 U.S.C. § 2194(m)(1)-(3). Congress established the Board specifically so Puerto Rico could "achieve fiscal responsibility and access to the capital markets." *Id.* § 2121(a). The Board must maintain an office in Puerto Rico. *Id.* § 2122. The Board does not receive federal funding; it is instead funded entirely by the territorial government of Puerto Rico. *Id.* § 2127. No federal officials serve on the Board, but the governor of Puerto Rico (or his designee) sits as an "ex officio member." *Id.* § 2121(e)(3). And the Board may incorporate into its "bylaws, rules, and procedures" any of Puerto Rico's "rules and regulations . . . it considers appropriate to enable it to carry out its activities." *Id.* § 2121(h)(3).

The Board's powers and functions likewise manifest its territorial character. As the district court explained, the Board's principal function is to "act[] as Puerto Rico's representative in invoking the debt adjustment authority of the federal government, just as a private debtor, trustee, or debtor in possession would do in settling an estate or pursuing a reorganization under the federal Bankruptcy Code." ADD-32. The Board, as Puerto Rico's representative, wields powers based on, and circumscribed by, Puerto Rico law. Its subpoena powers, for example, are limited by Puerto Rico's laws of personal jurisdiction, 48 U.S.C. § 2124(f), while its enforcement powers extend only to Puerto Rico laws "prohibiting public sector employees from participating in a strike or lockout," *id.* § 2124(h). And Puerto Rico governmental employees who intentionally provide false or misleading information to the Board are subject to prosecution under Puerto Rico, not federal, law. *Id.* § 2124(*l*).

The Board also wields its territorial authority at considerable distance from the United States Government. No federal official directs or manages the Board's operations, and the Board has its own legal counsel. 48 U.S.C. §§ 2124, 2128. Because the Board's members serve without compensation, *id.* § 2121(g), and because the Board's operations are funded entirely by Puerto Rico, *id.* § 2127(b), the federal government cannot control the Board's budget. And the only mechanism through which federal employees may work for the Board is through a detail pursuant to the Intergovernmental Personnel Act of 1970, 5 U.S.C. § 3371-3375, which authorizes the

detail of federal employees to *any* state or territorial entity (and vice versa). 48 U.S.C. § 2123(d).

Finally, PROMESA took pains not to subject the Board to "numerous federal laws that apply to federal agencies," including the Freedom of Information Act and the Administrative Procedure Act. ADD-32. Where Congress chose to incorporate federal laws for application to the Board, it clarified that those laws did not apply to the Board of their own force. *E.g.*, 48 U.S.C. § 2129(a) (subjecting the Board's members and staff to the "Federal conflict of interest requirements" in 18 U.S.C. § 208); *id.* § 2129(b) (requiring the Board's members to "conform to *the same requirements* set forth" in the federal Ethics in Government Act of 1978) (emphasis added). And Congress expressly authorized the "Administrator of General Services" to provide services to the Board, *id.* § 2124(n), which would have been superfluous if the Board were a "federal" or "executive" agency within the meaning of the General Services Administration's organic act. 40 U.S.C. §§ 102(4)-(5), 321(c)(2).

## II. Appellants' Contrary Arguments Lack Merit.

Appellants challenge the district court's ruling in two respects. First, in the face of two centuries of historical practice, they contend that territorial-government officials are subject to the Appointments Clause in the same manner as Article III judges and Cabinet officials. Second, appellants assert the Board is actually a federal entity to which the Appointments Clause does apply, notwithstanding Congress's express declaration

that the Board shall be an entity of the territorial government. The district court correctly rejected both arguments.

## A. Appellants' theory cannot be squared with longstanding historical practice or Supreme Court precedent.

Appellants' principal argument, which they press at length (Aurelius Br. 19-26; UTIER Br. 39-48), is that the Appointments Clause applies to anyone who meets the definition of "Officer of the United States" under *Buckley* and related cases—*i.e.*, anyone who occupies a continuing position and exercises significant authority pursuant to federal law. As already explained, that contention is foreclosed by Supreme Court precedent and would upend two centuries of democratic self-government in the territories. Appellants' efforts to avoid the logical implications of their arguments are unpersuasive.

### 1. Appellants offer no valid basis for distinguishing elected territorial officers.

Appellants do not seriously dispute that, for over two hundred years, Congress has provided for the democratic election of territorial officials who wield significant authority and whose offices are established by law. Because these officials would qualify as "Officers of the United States" if the Appointments Clause applied, the plain implication of appellants' argument is that democratic self-government in the territories violates the Constitution.

Recognizing the absurdity of this conclusion, appellants assert (Aurelius Br. 61-64) that elected territorial self-governance does not violate the Appointments

Clause. But appellants' invented "elections" exception to the Appointments Clause has no basis in the constitutional text. *See* U.S. Const. art. II, § 2, cl. 2. No one thinks Congress could provide for the popular election by citizens of Massachusetts of the U.S. Attorney in Boston, for example. Democratically elected territorial governments are constitutional not because the Appointments Clause excuses local elections, but because officers of a territorial government are not "Officers of the United States" within the meaning of that Clause.

Relatedly, appellants contend (Aurelius Br. 63-64) that territorial officials exercising authority pursuant to a home-rule arrangement are exercising not the sovereignty of the United States but the "sovereignty of the people of Puerto Rico." This too is makeweight. The Supreme Court has repeatedly held that "there is no sovereignty in a Territory of the United States but that of the United States itself." *Snow*, 85 U.S. at 321. Congress may, at its discretion, "[e]ntrust" to a territorial legislature the power to legislate on all matters upon which a state legislature may act. *Simms*, 175 U.S. at 168. But because territories possess "no independent sovereignty comparable to that of a state," *Domenech v. National City Bank of N.Y.*, 294 U.S. 199, 204 (1935), Congress remains the "ultimate source of the power undergirding" the territorial government, *Sanchez Valle*, 136 S. Ct. at 1871 (quotation marks omitted).

Indeed, appellants ignore that the Commonwealth is empowered to elect its own governor and legislature only because Congress enacted federal legislation allowing it to do so. If PROMESA were unconstitutional because it permits the appointment of

Board members without regard to the Appointments Clause, both the 1950 statute inviting the people of Puerto Rico to propose a constitution, 64 Stat. 319, and the 1952 statute approving that proposed constitution, 66 Stat. 327, would be invalid for the same reason.

### 2. Congress's voluntary adoption of Appointments Clause procedures does not mean the Appointments Clause applies to territorial officials of its own force.

Appellants also attempt to recast the history of territorial governance in their favor. They emphasize (Aurelius Br. 38-39; UTIER Br. 29-30) that Congress has over time provided for the appointment of certain territorial officials using Appointments Clause procedures. Yet they acknowledge (Aurelius Br. 61-64), as they must, that Congress has for centuries provided for alternative methods of selection as well. And this concession is fatal to their argument: on their view, Congress has routinely violated the Appointments Clause over the last two centuries, with no apparent objection. *But see Noel Canning*, 134 S. Ct. at 2576 ("historical practice" under the Constitution warrants "significant weight" in determining the meaning of the Constitution) (citing *M'Culloch*, 17 U.S. at 401). The more obvious answer is the right one: Congress's decision to borrow the familiar mechanisms of the Appointments Clause for particular offices does not suggest that it was constitutionally mandated to do so.

Indeed, Congress frequently adopted different appointment methods for the same office. Consider the Puerto Rico Commissioner of the Interior, who "superintend[ed] all works of a public nature, and [had] charge of all public buildings,

grounds, and lands, except those belonging to the United States." 31 Stat. at 81-82. When Congress first created the Commissioner's office in 1900, the Commissioner was subject to presidential nomination and Senate confirmation. *Id.* Just seventeen years later, without altering the commissioner's responsibilities, Congress provided that the commissioner would thenceforth be appointed by the territorial governor and confirmed by the territorial Senate. *See* 39 Stat. at 956.

Appellants urge the Court to infer (Aurelius Br. 37-38) that the First Congress amended the Northwest Ordinance to comply with the Appointments Clause. But the source on which appellants rely cites no evidence for that claim. And the source's author, Professor Currie, elsewhere explains that congressional "decisions respecting appointments" may have been "based on policy considerations rather than constitutional compulsion." David P. Currie, *The Constitution in Congress: The Jeffersonians, 1801-1829*, at 113-14 (2001). Professor Currie further notes that subsequent Congresses "appeared to think the only constitutional provisions that applied to the territories were those authorizing the United States to acquire and administer them." *Id.* It is therefore unsurprising that the Ordinance continued to provide for the direct election of the Northwest Territory's legislature even after it was amended.

Appellants argue (Aurelius Br. 39) that Arthur St. Clair, the first governor of the Northwest Territory, must have been subject to the Appointments Clause because he negotiated treaties on President Washington's behalf. But this argument ignores the long tradition of Presidents selecting a special envoy not appointed with the advice and

consent of the Senate to negotiate a treaty or to carry out another particular diplomatic mission. *See, e.g.*, 4 John Bassett Moore, *A Digest of International Law* § 632, at 452-57 (1906); 4 Green Haywood Hackworth, *Digest of International Law* § 375, at 412-14 (1942).

Appellants further argue (Aurelius Br. 40) that the Appointments Clause must apply to territorial offices because Presidents sometimes "sent the[] nominations" for District of Columbia Justices of the Peace "to be confirmed by the Senate" in the absence of a statutory command. But Congress routinely permitted territorial governors to appoint territorial justices of the peace without any federal oversight or participation. *See, e.g.*, 5 Stat. at 13 (Wisconsin); 5 Stat. 235, 237 (1838) (Iowa); 9 Stat. 403, 405, 407 (1849) (Minnesota); 9 Stat. 446, 449, 451-52 (1850) (New Mexico); 9 Stat. 453, 455-56 (1850) (Utah). Indeed, in Arkansas, Congress expressly provided that "justices of the peace . . . shall be chosen by joint vote of both houses of the [territorial] legislature." 4 Stat. 332, 332 (1829).

Appellants observe (Aurelius Br. 41-42) that Presidents have sometimes used recess appointments to fill territorial offices for which Congress had, by statute, required the Senate's advice and consent. Appellants suggest that, because those statutes did not contain a recess-appointment procedure, these appointments "must have been exercises of the President's constitutional" power under the Recess Appointments Clause—which in turn must mean the Appointments Clause governs territorial officials. Similarly, appellants argue in a footnote (Aurelius Br. 48 n.3) that

the presidential commissions given to some territorial officials supply "powerful evidence" that the Appointments Clause applies to all territorial officials.

Appellants' conclusion does not follow from their arguments. It is more likely that, when making recess appointments of territorial officers, the President treated his statutory appointment authority as an implicit granting of a recess-appointment power as well. If appellants were correct that the constitutional Recess Appointments Clause applies to all territorial officials, the territorial organic acts containing express grants of recess-appointment authority were wholly superfluous. *See* 1 Stat. 549, 550 (1798) (Mississippi); 2 Stat. 58, 59 (1800) (Indiana). As for the issuance of commissions, the constitutional requirement that the President "Commission all of the Officers of the United States," U.S. Const. art. II, § 3, does not prevent the President also from issuing commissions to territorial officials as evidence of their appointment and official authority. That commissions were issued to certain territorial officials does not mean those officials had to be appointed under the Appointments Clause.

Moreover, even if appellants were right that the President lacked authority to make certain recess appointments or to issue certain commissions, their arguments would demonstrate only that those historical acts were *ultra vires*. Those anomalous and marginal occurrences cannot undermine two centuries of Supreme Court case law and overwhelmingly consistent historical practice. *See Noel Canning*, 134 S. Ct. at 2567 ("But when considered against 200 years of settled practice, we regard these few scattered examples as anomalies.").

### 3. Appellants misread Supreme Court decisions concerning territorial judges, military officers, and federal property.

Appellants also mistakenly rely on a handful of Supreme Court cases about territorial courts, military officers, and federal property. None casts doubt on Congress's authority to provide for the appointment of territorial officials without regard to the strictures of the Appointments Clause.

First, appellants assert (Aurelius Br. 59-60) that the Supreme Court has treated territorial judges as "Officers of the United States" under the Appointments Clause, thus suggesting that the Clause must govern the appointment of all territorial officials. But appellants' premise is mistaken: The Supreme Court has never held that territorial judges are subject to the Appointments Clause. As the Supreme Court explained in *Englebrecht*, although territorial courts may adjudicate cases under the civil and criminal laws of the United States, Congress may permit them to be "elected by the people of the Territory[] and commissioned by the [territorial] governor." 80 U.S. at 447. That conclusion stands in stark contrast to *Lucia*, in which the Court held that SEC administrative law judges are "inferior Officers" who must be appointed in the manner required by the Appointments Clause. *See* 138 S. Ct. at 2049.

Appellants' contrary argument—which calls into question the constitutional legitimacy of the Supreme Court of Puerto Rico, whose members are appointed by the governor—relies on a misreading of *United States v. Ferreira*, 54 U.S. (13 How.) 40 (1851), where the Supreme Court noted in passing that the Appointments Clause would apply

to such judges "*if* they are to be regarded as officers." *Id.* at 51 (emphasis added). Of course, the Court's reasoning in *Englebrecht* subsequently made clear that territorial judges are *not* officers subject to the Appointments Clause. Appellants have similarly misread *Freytag*, which in dicta cited *Ex parte Hennen*, 38 U.S. (13 Pet.) 230, 258 (1839), for the proposition that clerks of territorial courts are inferior officers. *See Freytag*, 501 U.S. at 892. *Freytag*'s dicta did not address *Englebrecht*, and its reliance on *Hennen* was mistaken because *Hennen* concerned clerks not to an Article IV territorial court, but to a federal court established pursuant to Article III: the U.S. District Court for the Eastern District of Louisiana. 38 U.S. at 258; *see Freytag*, 501 U.S. at 914 (Scalia, J., concurring) (noting that *Hennen* "involved appointment by an Article III tribunal"). Territorial courts are not Article III courts but "legislative Courts, created in virtue of . . . that clause which enables Congress to make all needful rules and regulations, respecting the territory belonging to the United States." *Freytag*, 501 U.S. at 913 (Scalia, J., concurring) (quoting *American Ins. Co.*, 26 U.S. at 546). And like other territorial entities, territorial courts are "not subject to [the Constitution's] complex distribution of the powers of government." *Id.* (quoting *Benner*, 50 U.S. 235 at 242).

Appellants also offer a non sequitur (Aurelius Br. 36-37): that the Appointments Clause must constrain Congress's plenary power over territorial governance because it is undisputed that military officers must be appointed using Appointments Clause procedures. The only case appellants cite is *Ortiz*, 138 S. Ct. 2165, which held that the Supreme Court may validly exercise appellate jurisdiction over decisions of military

courts.  The Court supported that holding by analogizing to its authority to review the judgments of territorial courts.  But the Court's point was that it can exercise appellate jurisdiction over non-Article III courts.  The Court was not addressing whether all such courts are subject to the same structural constitutional constraints.  *Ortiz* certainly did not suggest that Congress's power over the territories is equivalent to Congress's power over the military; after all, military courts are within the Executive Branch and territorial courts are not.  And with respect to the latter context, *Ortiz* stressed Congress's "broad authority over the territories" and, in particular, its "power to create territorial courts that did not comply with Article III."  *Id.* at 2177.

Similarly, appellants argue (Aurelius Br. 33-35) that the Appointments Clause must apply to territorial officials because the Court has held that other separation-of-powers principles apply to Congress's Article IV authority to dispose of federal property.  Appellants cite the Supreme Court's decision in *United States v. Gratiot*, 39 U.S. (14 Pet.) 526 (1840), which they interpret to hold that Congress's power over the territories is coterminous with its power over other federal property.  While both powers are broad, however, Congress's plenary power over the territories is plainly different and greater than its authority to legislate for the disposition of federal property within the fifty States.  Indeed, the Supreme Court has repeatedly held that the Constitution applies in different respects to territories than to other federal property. *See, e.g.*, *Boumediene v. Bush*, 553 U.S. 723, 756-59 (2008).  Nobody thinks, for instance, that Congress could create an elected legislature to govern Yosemite National Park, or

provide for the direct election of the Director of the Bureau of Land Management. Yet for two centuries Congress has provided for the direct election of territorial legislatures and other officials—a practice that even appellants do not purport to contest.

### 4. PROMESA's list mechanism does not impermissibly aggrandize Congress's authority.

Finally, appellants argue (Aurelius Br. 26-32; UTIER Br. 52-54) that, to the extent the Appointments Clause applies to the Board, PROMESA's appointment provisions are unconstitutional. The United States agrees that, if the Appointments Clause applied to a territorial entity like the Board, the Board's members—like the governor, legislators, and justices of Puerto Rico—would likely be principal officers whose appointments would require presidential nomination and Senate confirmation. The Court need not decide that question, however, because the Appointments Clause does not constrain Congress's enactment of laws for the selection of territorial officials.

Nor need this Court decide whether PROMESA's list mechanism, in conjunction with the statute's deadline for appointment of the Board's initial members, impermissibly aggrandized Congress's power at the Executive Branch's expense. Appellants offer (Aurelius Br. 26-32) this alleged aggrandizement as evidence that PROMESA's appointment procedure would be unconstitutional even if the Board members were inferior (rather than principal) officers under the Appointments Clause. As already discussed, however, the United States agrees that, given the fact that no higher Executive official other than the President supervises their work, the members

of the Board likely would be principal (not inferior) officers if they were officers of the United States and the Appointments Clause applied. Appellants do not separately argue that the list mechanism renders the Board members' appointments invalid even if the Appointments Clause does not apply at all.

In any event, appellants could not prevail even if their aggrandizement arguments were analyzed as an independent constitutional claim. Such a claim, as a threshold matter, would not be justiciable. *See Federal Election Comm'n v. NRA Political Victory Fund*, 6 F.3d 821, 822, 824-25 (D.C. Cir. 1993) (concluding that a challenge to the composition of the Federal Election Commission was not justiciable because the court could not "assume[] that the President wished to appoint [different individuals] and was restrained by the [statute] from doing so," or that "the [appointment] requirement ha[d] any effect on the Commission's work, for without the statute the President could have appointed exactly the same members"). When selecting the Board's initial members for appointment, the President retained the option to reject the candidates on the lists; to request that the lists be supplemented with additional candidates; or to nominate his own candidates (with Senate confirmation) by the statutory deadline of September 1, 2016. 48 U.S.C. § 2121(e)(2)(G). President Obama selected and validly appointed all six candidates from the congressional lists (with the seventh chosen entirely at his discretion) on August 31, 2016, without first asking that the lists be supplemented.

As in *NRA Political Victory Fund*, appellants cannot "assume" that if the President had wished to nominate his own candidates, the Senate would not have confirmed those

candidates in time to meet the August 31, 2016 deadline.  PROMESA was enacted against the backdrop of the worst financial crisis in Puerto Rico's history.  As a result of that crisis, schools and hospitals closed their doors; public pension funds were grossly underfunded; and critical infrastructure projects ground to a halt.  And both Congress and the President had expressed their shared commitment to averting financial and humanitarian disaster.  It is true that the Senate was often in pro forma session during the statutory period, but the Senate can—and has—enacted legislation during pro forma sessions.  *Noel Canning*, 134 S. Ct. at 2575.[9]

Regardless, PROMESA's appointment procedures do not constitute impermissible congressional aggrandizement.  The aggrandizement doctrine "forestall[s] the danger of [congressional] encroachment beyond the legislative sphere" by preventing Congress from "invest[ing] itself or its Members with either executive power or judicial power."  *Metropolitan Wash. Airports Auth. v. Citizens for Abatement of Aircraft Noise, Inc.*, 501 U.S. 252, 274 (1991) (*MWAA*) (quotation marks omitted).  In many circumstances, encroachment presents serious constitutional concerns because "the separation of governmental powers into three coordinate Branches is essential to

---

[9] Appellants argue (Aurelius Br. 31), relying on one sentence from the House Report for PROMESA, that the list mechanism's "practical effect" was to ensure the selection of Board members by congressional leaders.  But the statute explicitly permitted the President to appoint unlisted individuals as well.  Appellants cannot simply "assume[] that the President wished to appoint [different individuals] and was restrained by the [statute] from doing so."  *NRA Political Victory Fund*, 6 F.3d at 824-25.

the preservation of liberty." *Mistretta v. United States*, 488 U.S. 361, 380 (1989). In ordinary domestic legislation, an attempt by Congress to pressure the President to select appointees from lists cultivated by congressional leaders would raise serious aggrandizement concerns. But this case concerns territorial governments that are "not organized under the Constitution[] nor subject to its complex distribution of the powers of government," but rather are "creations, exclusively, of the legislative department." *Benner*, 50 U.S. at 242. In the territorial context, the "legislative sphere," *MWAA*, 501 U.S. at 274, encompasses "the entire dominion and sovereignty, national and local, Federal and state," *Simms*, 175 U.S. at 168. The bar for impermissible aggrandizement in structuring a territorial government must therefore be high.

In the view of the United States, PROMESA's appointment structure—which encouraged, but did not compel, the President to select the Board's initial members from congressionally provided lists—falls short of that high threshold. For over two hundred years, Congress has excluded the President from the appointment of territorial officials entirely—most notably, by providing for territorial self-governance. And when Congress has elected to involve the President, it has often imposed limits. Under the Northwest Ordinance, Congress provided for the filling of certain territorial offices by requiring the territorial house of representatives to give the President a list of ten nominees, from which the President was required to select five persons for Senate confirmation. 1 Stat. at 52 note (a). Congress adopted the same procedure in the

organic acts for at least ten other territories.[10]  These examples provide some historical

pedigree for Congress's choice in PROMESA to limit the President's power in making

appointments to a territorial government.

Appellants attempt (Aurelius Br. 30-31; UTIER Br. 38-39) to analogize this case

to *MWAA*, *supra*.  But *MWAA* concerned not a territorial government but a

congressional attempt to transfer control over two domestic airports to a Board of

Review comprised exclusively of Members of Congress.  501 U.S. at 255.  The Supreme

Court held that the Board was unconstitutional because it was a "congressional agent"

that either (1) exercised legislative power pursuant to Article I without complying with

bicameralism and presentment or (2) exercised executive power pursuant to Article II

at the expense of the President.  *Id.* at 267, 276; *see Hechinger v. Metropolitan Wash. Airports

Auth.*, 36 F.3d 97, 105 (D.C. Cir. 1994) (agreeing with the United States that, even as

modified by Congress after *MWAA,* the Board of Review still represented "a sufficient

exercise of federal power to violate the doctrine of the separation of powers").

---

[10] 1 Stat. 123 (1790) (Southwest Territory); 1 Stat. 549 (1798) (Mississippi); 2 Stat. 58 (1800) (Indiana); 2 Stat. 309 (1805) (Michigan); 2 Stat. 514 (1809) (Illinois); 2 Stat. 322 (1805) (Orleans); 2 Stat. 743 (1812) (Missouri); 3 Stat. 493 (1819) (Arkansas); *see* Daniel J. Ryan, *A History of Ohio, with Biographical Sketches of Her Governors and the Ordinance of 1787*, at 51 (1888) ("[I]t was made their duty to nominate ten residents of the territory . . . , out of which five would be selected by the President to act as the Legislative Council, or Upper House of the Territorial Legislature."); 1 Logan Esarey, *History of Indiana From Its Exploration to 1922*, at 192 (1922) ("[The House of Representatives] nominated ten candidates from whom President Jefferson was to select five to constitute the Council.").

By contrast, as already explained, the Board is not a federal entity but a territorial one. In selecting the Board's members, the President is choosing not "Officers of the United States" to exercise legislative or executive power under Articles I or II, but officers of a territory to carry out territorial-governance functions under Article IV. *See Freytag*, 501 U.S. at 913 (Scalia, J., concurring) (explaining that territorial courts are "neither Article III courts nor Article I courts, but Article IV courts—just as territorial governors are not Article I executives but Article IV executives"). The reasoning of *MWAA* is thus inapplicable to territories on its own terms.

Unlike the statute invalidated in *MWAA*, moreover, PROMESA does not require members of Congress themselves to be on the Board. It merely encourages the President to nominate Board members from congressionally provided lists. And the statute also reserves to the President the authority to nominate and appoint his own candidates with the advice and consent of the Senate. 48 U.S.C. § 2121(e)(2)(E). The Court cannot assume that Congress would have refused to confirm such appointees amid the looming humanitarian crisis in Puerto Rico if the President had done so. Particularly given that Congress can omit the President from any role at all in the appointment of territorial officials (for example, by providing for their direct election), PROMESA's list mechanism, taken as a whole, does not impermissibly aggrandize Congress's power at the expense of the President.

Finally, even if appellants were correct on this score, their argument would not entitle them to the dramatic relief they seek: dismissal of every pending Title III

proceeding. *See* Aurelius Br. 64-67; UTIER Br. 54-55. President Obama appointed the Board's members on August 31, 2016, before the statutory deadline. And that deadline will not constrain the President's authority to select future members of the Board. PROMESA provides that future vacancies will be filled "in the same manner in which the original member was appointed." 48 U.S.C. § 2121(e)(6). The statutory deadline of "September 1, 2016," *id.* § 2121(e)(2)(G), could not possibly apply to these vacancies. Accordingly, the President may fill any future vacancy by choosing candidates off a congressional list (supplemented, as needed, by additional names), or by nominating candidates for Senate confirmation without any particular deadline. Appellants' contrary interpretation of these provisions (Aurelius Br. 32) cannot be reconciled with their text. And even if appellants' interpretation were possible, principles of constitutional avoidance would counsel against adopting it. *See Edward J. DeBartolo Corp. v. Florida Gulf Coast Bldg. & Constr. Trades Council*, 485 U.S. 568, 575 (1988). But if the Court were to conclude that PROMESA's list mechanism was impermissible, the appropriate remedy would simply be to remand for a declaratory judgment that those provisions shall be inoperable. *See Free Enter. Fund v. Public Co. Accounting Oversight Bd.*, 561 U.S. 477, 513 (2010) (adopting a similar declaratory remedy).

## B. The Board is an entity within the territorial government of Puerto Rico.

Appellants also urge that, even though Congress declared the Board to be an entity "within the territorial government" of Puerto Rico, 48 U.S.C.

§ 2121(c)(1), the Court should treat the Board as a traditional federal entity to which the Appointments Clause applies. This contention is meritless. Congress has broad authority to prescribe the form and organization of territorial governments, and it has repeatedly exercised that authority with respect to Puerto Rico. In confronting the Commonwealth's fiscal crisis in 2016, Congress could have provided, for example, that Puerto Rico would have two elected governors, each empowered to check the spending of the other. Or it could have created a new legislative body tasked with supervising the Commonwealth's fiscal policy. Instead, Congress left intact the existing structures of the Commonwealth government, but established the Board as a new agency of that government and imbued it with powers to supervise the Commonwealth's finances. That choice was plainly within Congress's authority, and appellants identify no proper basis to second-guess this legislative judgment.

As we have explained, furthermore, the mandate, structure, powers, and functions of the Board confirm its territorial character. In urging otherwise, appellants complain (Aurelius Br. 50) that the district court "invented a novel multi-factor test" to evaluate the Board's territorial nature, rather than employing the factors that the Supreme Court has previously used in cases like *Lebron v. National Railroad Passenger Corp.*, 513 U.S. 374 (1995), to distinguish between governmental entities and *private* ones. But the *Lebron* test answers a different question and cannot be transplanted wholesale into this context. Many of the factors in the *Lebron* analysis—such as the extent to which the entity is intended to achieve governmental objectives—shed no light on

whether a concededly governmental entity is part of the territorial government or the United States Government. That is a choice for Congress to make in the exercise of its plenary power over the territories; the Constitution does not constrain that choice. Because the inquiry in these appeals concerns whether Congress created a federal or territorial entity, the court correctly gave "substantial deference" to "Congress's determination that it was acting pursuant to its Article IV territorial powers." ADD-23. The district court also sensibly determined that its assessment of appellants' challenge to Congress's declaration of the Board's status would be informed, but not controlled, by the criteria set forth by *Lebron* and its progeny. ADD-22 n.13. In substance, moreover, *Lebron* considered many of the same factors on which the court relied—including Amtrak's "nature and history," 513 U.S. at 383; its purpose and "goals," *id.* at 384; its "structure and powers," *id.* at 384-86; and the extent to which Amtrak's operations were subject to federal control, *id.*[11]

Appellants' real disagreement lies not with the district court's test but with the district court's conclusion. Their principal argument (Aurelius Br. 45-46; UTIER Br. 34-37) is that the Board's objectives are federal, not territorial, because Puerto Rico's financial condition impacts creditors located throughout the United States. But

_____

[11] In *Altair Global Credit Opportunities Fund (A), LLC v. United States*, the Court of Federal Claims applied the *Lebron* criteria to conclude that, for purposes of establishing Tucker Act jurisdiction, the Board is a component of the United States Government and not the territorial government of Puerto Rico. No. 17-970C, 2018 WL 3425051 (Fed. Cl. July 13, 2018). The government respectfully disagrees with that ruling.

appellants have conflated the nationwide implications of the Board's responsibilities with the nature of the Board itself. Before PROMESA's enactment, the governor and legislature of Puerto Rico already had power to develop fiscal plans, to propose budgets, and to issue debt. In exercising those powers, the territorial government undoubtedly "implicate[d] the substantial rights of creditors" nationwide, *see* Aurelius Br. 46; indeed, the nationwide impact of Puerto Rico's fiscal crisis stems in significant part from bonds issued by the Commonwealth of Puerto Rico and made open for purchase to all comers, *see* 48 U.S.C. § 2194(m)(1). If Congress had elected to address Puerto Rico's financial crisis not by creating an Oversight Board but by requiring by law that the governor and legislature of Puerto Rico use their preexisting powers in a particular way, that decision would not have transformed the territorial government into a federal agency.

Appellants next argue (Aurelius Br. 46-50) that the Board is a federal entity because its members are appointed by the federal government. But that argument proves too much. As appellants acknowledge (Aurelius Br. 38-39), many territorial officials throughout history—including "civilian territorial governor[s]"—were appointed by the President with the advice and consent of the Senate. The source of appointment alone does not determine the character of a territorial entity. The Supreme Court in a related context held that the District of Columbia was a municipal and not a federal entity, notwithstanding the fact that the District's commissioners were appointed by the President with the Senate's advice and consent. *Metropolitan R. Co. v.*

*District of Columbia*, 132 U.S. 1, 8 (1889). "The mode of appointing [the District's] officers d[id] not abrogate its character as a municipal body politic." *Id.*

Appellants also assert (Aurelius Br. 21-26, 48-50; UTIER Br. 42-49) that the Board's members exercise significant authority on the federal government's behalf. The Board's members, however, like other officers of the territorial government, exercise their authority on behalf of the people of Puerto Rico, within the limits and subject to the requirements Congress has prescribed. That is true of all territorial officials, whose authority to act must be "trace[d] . . . all the way back" to the "Federal Government." *Sanchez Valle*, 136 S. Ct. at 1876. And so too do many State officials, who may exercise significant authority derived from the sovereign power of the United States without even being appointed as "Officers of the United States." 31 Op. O.L.C. 73, 99-100 (Apr. 16, 2007). Nor does it matter, as appellants propose (Aurelius Br. 55; UTIER Br. 50), that the Board was created by a federal statute. So was every past and present territorial government, including the current government of Puerto Rico.

In a similar vein, appellants argue (Aurelius Br. 55; UTIER Br. 50) that the federal government controls the Board's operations because the Board must report its activities to Congress and the President, and because the President may remove Board members "for cause." But the federal government possesses this degree of control over *all* territorial governments, which remain "at all times subject to such alterations as Congress may see fit to adopt." *Snow*, 85 U.S. at 320. That supervisory authority is not merely theoretical. Congress has exercised it to divide one territory into two, and to

move representatives from one territorial government to another. *See* 3 Stat. 371, 372 (1817) (creating the Alabama Territory from the Mississippi Territory and populating the former's legislature with legislators from the latter). Congress has eliminated certain territorial offices when creating others. *Compare* 31 Stat. at 82 (creating a legislative assembly for Puerto Rico with an "executive council" and a "house of delegates"), *with* 39 Stat. at 958-99 (replacing Puerto Rico's existing assembly with a "senate" and "house of representatives"). Congress has often explained that it retains inherent authority to nullify territorial acts of which it disapproves. *See, e.g.,* 5 Stat. at 13 ("All the laws of the [Wisconsin territory] shall be submitted to, and, if disapproved by the Congress of the United States, the same shall be null and of no effect."). And Congress has exercised that authority in the past, most notably with respect to Puerto Rico's proposed constitution.

In sum, appellants have failed to provide any basis to disregard Congress's express declaration that the Board shall be an entity of the territorial government of Puerto Rico. And because the Board is a territorial entity, appellants' Appointments Clause challenge must fail. But, even if the Court were to accept appellants' Appointments Clause challenge, appellants would not be entitled to the remedy they seek—dismissal of all Title III proceedings. Instead, Court should remand with instructions to the district court to enter a declaratory judgment that the offending appointment procedures in PROMESA are unconstitutional and should be severed. *See, e.g., Free Enter. Fund,* 561 U.S. at 508-510. That disposition would avoid unwinding

the significant progress the Title III proceedings have made toward restoring Puerto Rico's financial stability under PROMESA.

## CONCLUSION

For these reasons, the judgments of the district court should be affirmed.

Respectfully submitted,

JOSEPH H. HUNT
  *Assistant Attorney General*

THOMAS G. WARD
  *Deputy Assistant Attorney General*

MARK R. FREEMAN
MICHAEL S. RAAB
MICHAEL SHIH

  */s/ Laura E. Myron*
LAURA E. MYRON
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7222*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 514-4819*
  *laura.e.myron@usdoj.gov*

OCTOBER 2018

# CERTIFICATE OF SERVICE

I hereby certify that, on October 1, 2018, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the First Circuit by using the appellate CM/ECF system. Participants in the case are registered CM/ECF users, and service will be accomplished by the appellate CM/ECF system.

*/s/ Laura E. Myron*
Laura E. Myron

**CERTIFICATE OF COMPLIANCE**

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 12,930 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Microsoft Word 2013 in Garamond 14-point font, a proportionally spaced typeface.

*/s/ Laura E. Myron*

Laura E. Myron